UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In Re:                                              Chapter 7

Joseph Yerushalmi,                                  Case No. 807-72816-478

      Debtor.                                       Affirmation in Support

-----------------------------------------------------------X

      Marc A. Pergament, duly affirms under the penalties of perjury as follows:

      1.    I am an attorney admitted to practice law in the United States Court of Appeals for the Second Circuit and the United States District Court for the Eastern and Southern Districts of New York and am a partner in the law firm of Weinberg, Gross & Pergament LLP, attorneys for Marc A. Pergament, Chapter 7 Trustee ("Trustee") of the Estate of Joseph Yerushalmi ("Debtor").

      2.    I am also the Trustee of this Estate, having duly qualified as such, and by operation of law, became the permanent Trustee of this Estate.

      3.    This Affirmation is presented in support of my motion for an Order:

          a.    pursuant to Sections 363(b), (f) and (m) of the United States Bankruptcy Code authorizing the Trustee to sell his right, title and interest in 288 shares of Netline Communications Technologies (NCT) Ltd. ("Netline"), an entity organized under the laws of the State of Israel, which the above-captioned Debtor owned through an entity known as Enjoy Capital, LLC, to King Capital, Inc., for the sum of $90,000.00, free and clear of all claims, liens and

encumbrances, with such claims, liens and encumbrances to attach to the proceeds, subject to higher and better offers and a right of first refusal under the Articles of Association of Netline as set forth in the Asset Sale and Purchase agreement dated February 4, 2014 ("ASPA"), a copy of which is annexed hereto as Exhibit "A;"

b.  authorizing the Trustee to execute all documents necessary to effectuate the sale of his interest in Netline and as more fully set forth in the Asset Sale and Purchase Agreement dated February 4, 2014;

c.  pursuant to 11 U.S.C. § 105(a) directing the Debtor to execute all documents required to effectuate the transfer of 288 shares of Netline from Enjoy Capital, LLC to the Trustee or in the alternative, authorizing the Trustee to execute such documents; and

d.  such other and further relief as this Court deems just and proper ("Motion").

<u>FACTS</u>

4.  On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Thereafter, on October 2, 2007, the Court (Rosenthal, U.S.B.J.) converted the case from one under Chapter 11 to Chapter 7.

5.  Following conversion of the case, I was appointed the Trustee of the Estate. Following my appointment as Trustee, I conducted the 341 Meeting of the Debtor.

6.  As of the Petition date, one of the Debtor's assets was his stock holdings in a company known as LSL Biotechnologies, Inc.  (Annexed hereto as Exhibit "B" is a copy of Schedule B to the Debtor's voluntary petition.)

7.      As of the Petition Date, the Debtor was a "25.5% Shareholder" of LSL Biotechnologies, Inc. (*See* Ex. B.)

8.      By Order dated March 17, 2008, the Court (Feller, U.S.B.J.) approved my request to sell the Estate's interest in LSL Biotechnologies, Inc.   Initially, I entered into an agreement to sell the Estate's interest for the sum of $175,000.00, subject to higher and better offers. Through the auction process, I obtained the sum of $215,000.00. (*See* Bankruptcy Case Docket ECF Number 123.)

9.      Under the March 17, 2008 Order, the Estate's interest in the share of LSL Biotechnologies, Inc. was sold to LSL Biotechnologies, Inc. LSL Biotechnologies, Inc. was represented by Marilyn Simon, Esq. (*See* Bankruptcy Case Docket ECF Number 123.)

10.     Following the approval of the sale, my counsel coordinated the closing of the transaction with Muchnick, Golieb and Golieb, P.C. who was Ms. Simon's co-counsel[1].

11.     In addition to LSL Biotechnologies, Inc., as of the Petition Date, the Debtor was a 1.4% shareholder of the shares of Netline, believed to be 288 shares.  (*See* Ex. B.)

12.     Netline is an Israeli based company that is engaged in the development, manufacturing and marketing of electronic warfare systems, primarily for wirelessly blocking frequencies and defense against explosive charges.

13.     In this Motion, I am seeking approval to sell the Estate's interest in Netline for the sum of $90,000.00, subject to higher and better offers and in accordance with the Articles of Association of Netline.

---

[1] Muchnick, Golieb and Golieb, P.C. is counsel to King Capital, Inc., the proposed purchaser herein. I have no personal relationship with any of the firm's attorneys and employees, nor did I solicit the firm for an offer to purchase the Estate's interest in Netline.

LEGAL AUTHORITIES

14.    "Property of the estate" is defined under the Bankruptcy Code as, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). (Westlaw, 2014.)

15.    "A debtor's interest in stock of a corporation is property of the estate." *In re Meade*, 84 B.R. 106, 107 (Bankr.S.D.Ohio 1988) ("Stocks and other forms of securities are regarded by the courts as property of the estate."); *In re Cormier*, 382 B.R. 377, 386 (Bankr.W.D.Mich. 2008).

16.    The Estate's ownership interest in Netline is based on the Debtor's Schedule B. A debtor cannot challenge a representation that he is the owner of certain property when he so identifies the property as an asset of the estate. *See In re Messina*, 2003 WL 22319416, *12 (Bankr.N.D.Ill. September 29, 2003)["The Court finds that each of these elements is present in this matter, thereby estopping the [d]ebtor from challenging the ownership of the funds in the declaratory judgment action."

17.    In applying the doctrine of equitable estoppel, the *Messina* court concluded that the trustee was entitled to rely on the debtor's "representation in his amended Schedule B that the performance bond was property of the estate." *Id*.

18.    Here, based on the Debtor's sworn representation, there cannot be any dispute that the Debtor owned 288 shares of Netline as of the Petition Date. Accordingly, the 288 shares of Netline are property of the Estate.

19.    11 U.S.C. § 363(b)(1) provides, in pertinent part, that: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...." (Westlaw, 2014.)

4

20.    Courts have uniformly held that approval of a proposed sale of a debtor's assets outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that sound business reasons justify the transaction. *See In re Lionel Corp,* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Chateaugay Corp.,* 973 F.2d 141, 143-145 (2d Cir. 1992)(affirming the debtors' ability to sell "an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization"); *see also In re Chrysler LLC,* 405 B.R. 84, 95 (Bankr.S.D.N.Y. 2009) ("there has to be some articulated business justification for the use, sale or lease of property outside of the ordinary course of business") (internal citations omitted), *aff'd,* 576 F.3d 108 (2d Cir. 2009).

21.    Once a trustee articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted).

22.    The business judgment of a trustee "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re Aerovox, Inc.,* 269 B.R. 74, 80 (Bankr.D.Mass. 2001) (internal citations omitted).

23.    Indeed, the business judgment standard is subject to great judicial deference. *In re Bakalis*, 220 B.R. 525, 532 (Bankr.E.D.N.Y. 1998)(Feller, U.S.B.J.).

24.    The decision of a trustee to sell assets will not be disturbed "unless it is shown that the trustee 'acted in an irrational, arbitrary, or capricious manner, clearly contrary to

5

reason and not justified by the evidence.'" *In re Fas Mart Convenience Stores, Inc.*, 265 B.R.

427, 431 (Bankr.E.D.Va. 2001) (*citing In re Pierce*, 237 B.R. 748, 754 (Bankr.E.D.Cal. 1999)).

25.     As noted by the court in *In re Dura Automotive Systems, Inc.*, 2007 WL

7728109 (Bankr.D.Del. August 15, 2007), 11 U.S.C. § 363(f) permits the sale of a debtor assets

to be sold free and clear of liens, claims, interests and encumbrances if:

> (a)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;
> (b)     such entity consents;
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
> (d)     such interest is in bona fide dispute; or
> (e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

26.     As set forth more fully below, the ASPA comports with these standards.

27.     In addition, "[s]ection 363(m) limits the scope of appellate review of

unstayed section 363 sale orders to the issue of the purchaser's good faith - generally mooting

appeals brought on other grounds and thus protecting good faith purchasers from the effects of

reversal or modification on appeal once the sale has closed." *In re Motors Liquidation Co.*, 428

B.R. 43, 46 (S.D.N.Y. 2010).

28.     The purpose of 11 U.S.C. § 363(m) is to maximize the sale price of estate

assets by providing assurances to the purchaser of the finality of the sale by eliminating the

prospect of litigation concerning claims to the property. *In re Gucci*, 126 F.3d 380, 385 (2d Cir.

1997).

29.     Under the Bankruptcy Code, "[s]o long as a trustee conducts the affairs of

the estate by exercising his business judgment in good faith, upon a reasonable basis, and within

the scope of his authority under the Code, he may proceed without interference." *In re Consolidated Auto Recyclers, Inc.*, 123 B.R. 130, 140 (Bankr.D.Me. 1991) (*citing In re Curlew Valley Associates*, 14 B.R. 506, 513–14 (Bankr.D.Utah 1981)).

30.     Although the Bankruptcy Code does not define the meaning of "good-faith purchaser," most courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims." *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *See Gucci*, 126 F.3d at 390.

31.     Notwithstanding the foregoing, there is a strong policy favoring competitive bidding and finality to sales in bankruptcy proceedings. *In re Dartmouth Audio, Inc.*, 42 B.R. 871 (Bankr.D.N.H.1984).

32.     Generally, a purchaser who pays 75 percent of the appraised value of the assets has tendered value. *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 n. 1 (7th Cir. 1978). ["Fair and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets. MacLachlan, Handbook of the Law of Bankruptcy 348 (1956)".]

33.     However, "where the purchaser is found to have acted in good faith the auction price suffices to demonstrate that the purchaser paid 'value' for the assets." *Gucci*, 126 at 390.

34.     Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. *See In re Colony Hill Associates*, 111 F.3d 269, 276 (2d Cir.1997) ["The 'good faith' component of the test under § 363(m) speaks to the equity of the bidder's conduct in the course of the sale proceedings.")

7

35.    A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bakalis*, 220 B.R. 525, 537 (Bankr.E.D.N.Y. 1998)(Feller, U.S.B.J.) (Citations omitted).

36.    To obtain the best possible price for my interest in the Netline shares, the shares will be offered at an auction, subject to higher and better offers. *See In re Landscape Properties, Inc.*, 100 B.R. 445 (Bankr.E.D.Ark. 1988) ["It may be that the only avenue available to the [t]rustee which would accommodate all the concerns and which will accord the fullest possible measure of fairness and finality is by way of a public auction."]

37.    At the time that Enjoy, an entity in which the Debtor was a member, acquired its interest in Netline, the acquisition was subject to its Articles of Association, which contains certain provisions relating to the transfer of shares by a shareholder, and in particular, Article 19 of the Articles of Association. (*See infra*, Ex. G.)

38.    However, even though the provisions of a shareholder agreement may restrict a trustee's sale of a debtor's stock interest, a trustee is nonetheless permitted to sell said stock via law auction to obtain the best possible price. *See In re Cormier*, 382 B.R. 377, 388 (Bankr.W.D.Mich. 2008) (citations omitted), which states as follows:

> The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. Finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself. An auction sale should be conducted in compliance with the bidder's reasonable expectations. This court, in deciding this contested matter, should be mindful to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets.

8

39.     The existence of Article 19 of the Articles of Association does not impede my ability to sell the 288 shares of Netline via an auction to ensure maximum value for the Estate. I intend to comply with Article 19.

## THE FIRST SALE MOTION

40.     On or about April 27, 2012, I entered into an agreement with King Capital, Inc. to sell the shares of Netline owned by the Estate to King Capital, Inc. for the sum of $150,000.00.

41.     By motion dated September 10, 2012, I sought approval to sell the shares of Netline owned by the Estate to King Capital, Inc. for the sum of $150,000.00 ("Sale Motion I").

42.     Following service of Sale Motion I, I received objections from the Debtor and from Avishay Levanovsky ("Levanovsky") in his capacity as Trustee of the Yerushalmi Family Trust ("YFT"). In order to properly review their objections, I withdrew Sale Motion I. (Annexed hereto as Exhibit "C" is the Debtor's Affidavit sworn to on September 4, 2012 in Opposition to Sale Motion I; annexed hereto as Exhibit "D" is the Affidavit of Thomas J. McGowan, Esq., sworn to on September 4, 2012; annexed hereto as Exhibit "E" is the Opposition of Avishay Levanovsky as Trustee of the YFT, sworn to on September 3, 2012 and annexed hereto as Exhibit "F" is the Affidavit of Avishay Levanovsky, sworn to on September 3, 2012.)

43.     One objection raised by both the Debtor and Mr. Levanovsky concerned the number of shares being sold by the Estate. The Debtor argued that I sought to sell an unspecified number of shares of Netline, while Mr. Levanovsky argued that the Debtor owned no more than 288 shares of Netline, not 481 being sold via Sale Motion I.

9

44.    As noted above, the Debtor did not specify the number of shares of Netline that he actually owned on the schedules to his Petition. Instead, under penalty of perjury, the Debtor reported that he owned 1.4% of the outstanding shares of Netline.

45.    Interestingly, in his September 4, 2012 affidavit, the Debtor swore to the following:

> Although I believe that I do own an approximately 1.5% interest in Netline "through Enjoy," I note that both Mr. E'Dan, the former YFT trustee who sat on the Board of Directors of Netline, and Mr. Levanovsky, the current trustee of the YFT, contend that the YFT owns that 1.5% interest along with the additional 1% that I concede it owns." (Ex. C, ¶ 16.)

46.    Although the Debtor swore to the facts in his schedules, including that he owned 1.4% of Netline shares, not 1.5% as suggested in his affidavit, neither this Court, nor I, have any basis to reject the Debtor's representation, especially since a misrepresentation would constitute a false oath under 11 U.S.C. § 704.

47.    Regardless, neither the Debtor, nor Mr. Levanovsky, has presented any evidence to contradict the Debtor's sworn statement that he [the Debtor] owned 1.4% of the outstanding shares of Netline.

48.    It is my understanding that Enjoy, the vehicle through which the Debtor owned his interest in Netline, was formed in 1998 as a joint venture between the Debtor and the Oxford Family Trust to purchase investments, including the Netline shares.

49.    Mr. Oded E'Dan ("E'Dan")[2] was the trustee of the Oxford Family Trust. It is also my understanding that E'Dan had been a trustee YFT.

---

[2] It is my understanding that E'Dan was involved with LSL Biotechnologies, Inc.

10

50.     In or about early 2000, Enjoy purchased 962 shares of Netline, which represented 5.5% of the outstanding shares of Netline.

51.     Over time, I learned that differences arose between the Debtor and E'Dan causing them to divide Enjoy's ownership of Netline. As a result, 481 shares of Netline were apparently transferred to the Oxford Family Trust with the remaining 481 shares purchased by Enjoy being retained by the Debtor.

52.     Thereafter, the Debtor allegedly transferred certain numbers of the Netline shares that were owned by Enjoy to the YFT, leaving the Debtor with 1.4% or 288 shares of Netline.

53.     In his opposition to Sale Motion I, Mr. Levanovsky states that "it is undisputed that at least 193 shares are owned by the YFT. My predecessor trustees informed me that the other 288 Netline share also belong to the YFT, while Mr. Yerushalmi claims that these 288 shares are owned by him personally." (Ex. E, p.1.)

54.     At no time has Mr. Levanovsky undertaken to challenge the Petition and the Debtor's sworn statement that he owned 1.4% of the outstanding shares of Netline in his individual capacity.

55.     Further, not only did Mr. Levanovsky fail to produce any evidence to support his contention, at the conclusion of his opposition, Mr. Levanovsky, on behalf of the YFT, offered to purchase the Estate's 288 shares of Netline. (Ex. E, p.2.)[3] Based on the foregoing, it appears that there is no dispute that the Estate owns 288 shares of Netline.

---

[3] It does not appear that the YFT's offer to purchase all 288 shares of Netline was consistent with the Articles of Association as each existing shareholder must be provided with an opportunity to purchase a portion of the Debtor's shares in an amount equal to the existing shareholder's *pro rata* interest in Netline.

56.    Under the ASPA, I am seeking to sell only the 288 shares owned by the Debtor as of the Petition Date. I am not seeking to sell any shares that are purportedly owned by the YFT.

57.    Both the Debtor and Levanovsky asserted that Enjoy's purchase of the Netline shares was and is subject to the Articles of Association. (Ex. C, ¶ 1, 9, 10 and 11; Ex. F, ¶ 7.)

58.    Prior to Sale Motion I, the Debtor had neither provided me with a copy of the Articles of Association nor disclosed the existence of them to me.

59.    The Debtor's failure to advise me of the Articles of Association is particularly interesting since the bulk of the Debtor's objection was based on my alleged failure to comply with the provisions concerning a shareholder's sale of Netline stock.

60.    I withdrew Sale Motion I to investigate the issues raised by the Debtor and Mr. Levanovsky, which included the retention of J. Richter, Herzberg, Yogev & Co. ("RHY"), special counsel to the Trustee, and Tafnit Investigation ("Tafnit"), as private investigator for the Trustee.[4]

<u>THIS SALE OF NETLINE SHOULD BE APPROVED</u>

61.    Since the withdrawal of the Sale Motion I, I have retained special counsel in Israel to assist me with the sale of the Netline shares and who has confirmed the existence and validity of the Articles of Association. (Annexed hereto as Exhibit "G" is a copy of the Articles of Association.)

---

[4] By Orders dated December 5, 2012 and August 19, 2013, this Court approved the retention of RHY and Tafnit, respectively.

62.     In addition, I engaged Tafnit who is sufficiently qualified to research and investigate the economic and financial standing of Netline and to help me determine the fair market value of Netline's shares.

63.     With the assistance of RHY, I solicited the existing shareholders of Netline to ascertain whether they had any interest in purchasing the 288 shares.

64.     None of the shareholders expressed an interest in purchasing these shares.

65.     King Capital, Inc. is also aware of the existence of the Articles of Association and the restrictions, limitations and obligations imposed on shareholders of Netline.

66.     Section 19 of Articles of Association requires that a shareholder seeking to sell its interest in Netline:

> shall be required to first offer the shares that such shareholder wishes to transfer (the "Offered shares") to the other shareholders of the Company (the "Offerees"), pro rata to their respective interests in the Company, ... [which shall] include ... (iii) the price that the Selling Party intends to receive in respect of the Offered shares, which shall be stated in cash, and requested terms of payment thereof. (*See* Ex. G.)

67.     Under the foregoing, each existing shareholder of Netline may purchase a portion of the Estate's 288 shares equal to such shareholder's pro rata interest in Netline at a predetermined price. Section 19 does not initially give any existing shareholder the right to purchase more than its *pro rata* interest in Netline.

68.     Following the withdrawal of the Sale Motion I and conclusion of my investigation, my counsel and counsel for King Capital, Inc. negotiated the Asset Sale Agreement wherein King Capital, Inc. has agreed to purchase the Estate's 288 shares of Netline (1.4% of the outstanding shares) for the sum of $90,000.00 or $312.50 per share.

13

69.    At $312.50 per share, the Estate's creditors will reap a substantial benefit. In my business judgment, it is better for the creditors to receive $90,000.00 rather than nothing.

70.    Nevertheless, the ASPA requires approval of this Court, subject to any higher or better offers that may be tendered to me prior to or at the Sale Hearing scheduled by this Court.

71.    I am also sending a notice to all parties who may have an interest in bidding at the auction to be held before this Court.

72.    Simultaneously with the service of this Motion, I placed an advertisement with the New York Times and in local newspapers in Israel. I will also notify the existing shareholders in the event that any of them wish to place a bid on the Estate's entire interest in the Netline shares.

73.    Any prospective purchaser will be required to submit a written offer for the Estate's interest in the Netline shares together with proof that such prospective purchaser has the financial wherewithal to consummate the purchase. The offer shall also provide that the transaction shall be consummated within thirty (30) days of an entry of an Order approving the offer.

74.    In addition, with its proposal, such proposed purchaser must provide me with a deposit, in the form of a bank check, in an amount of ten (10%) percent of the offer or $9,500.00, whichever sum is greater. It is understood that I will hold such deposit in escrow pending this Court's determination regarding the sale of the assets and in accord with the accompanying notice.

75.    The deposit shall either be applied toward the purchase price if the offer is accepted and automatically deemed non-refundable.

14

76.    In the event the offer is the second highest or better offer, I shall retain the deposit pending the closing with the highest or better offer and in the event the winning offeror fails to close within the later of thirty (30) days of the entry of the Order and compliance with Article 19 of the Articles of Association as described below, the second offeror shall be obligated to close within thirty (30) days after notice from me.

77.    While the creditors of the Estate would definitely benefit from the $90,000.00 sale price, I would welcome any offers from any individual or entity with the requisite financial wherewithal to purchase the shares at a price greater than $312.50 per share.

78.    The bidding process will insure that the Estate receives the best available price while maintaining the integrity of the Articles of Association. In addition, the bidding process should prevent any fraud or collusion.

79.    Once this bidding process is concluded, which should help establish the good faith processes surrounding the sale of the Netline stock, and this Court approves the purchase price, the final price will be established.

80.    Thereafter, in accordance with Section 19 of the Articles of Association, I will present the final price to the existing shareholders in the form required under Section 19(a) of the Articles of Organization so that each may each consider the Right of First Offer and decide whether they want to purchase their *pro rata* portion of the 288 shares being sold under the Asset Sale Agreement.

81.    In the event that any existing shareholder declines to purchase its *pro rata* share of the Estate's shares within the time frame set forth in Paragraph 19(b) of the Articles of Organization, my counsel will "notify all of the other shareholders and they shall be entitled to purchase any remaining shares within 7 days in accordance with the Offer, *pro rata* to their

respective interests in the Company or otherwise as may be agreed among them." (Ex. F, ¶ 19(c).)

82.     Thereafter, my counsel shall seek approval of the Board of Directors of Netline to sell the remaining shares of King Capital, Inc.

83.     Specifically, Paragraphs 19(d) and (e) of the Articles of Organization provide:

(d)     there remain any shares that have not been acquired by the shareholders as specified above, than the Selling Party may sell such shares to a third party, provided that such sale is consummated (i) in a bona fide transaction; and (ii) at a price that is not lower than that specified in the Offer; and (iii) subject to payment terms that are no more favorable to the purchaser than those specified the Offer; all within 90 days of the expiration of the period specified in Article 19© (sic) above.

(e)     If the shares are sold to a third party in such manner, the Company shall be required to approve the transfer of the shares, provided that the transfer is in accordance with the terms contained in the Offer, and further provided that the transfer of the shares is not adverse to the Company's interest, as reasonably determined by the Board of Directors. (Ex. G, ¶¶ 19(d) and (e).)

84.     Following, compliance with Paragraph 19 of Articles of Association, I will either close with those shareholders that have expressed an interest to purchase its *pro rata* share of the Estate's shares and the balance, if any, will be sold to King Capital, Inc. or the winning offeror, subject to the approval of Netline's Board of Directors.

85.     The Debtor previously complained that the price being paid by King Capital, Inc. was insufficient. However, the Debtor's argument misses the boat.

16

86.    I am attempting to marshal the Debtor's assets for the benefit of its creditors. In that regard, I am attempting to procure the best available price for the Debtor's Estate. Nevertheless, even if the Debtor could establish that the purchase price is below market value, the proposed sale to King Capital, Inc. (or to the existing shareholders of Netline as the case may be) should result in the Estate realizing substantial recovery in the sum of $90,000.00.

87.    I have no relationship with King Capital, Inc. or any of its attorneys. The only contact that I have had with King Capital, Inc. and its attorneys was through the sale of the Estates' interest in LSL Biotechnologies, Inc.

88.    It appears that the Debtor's motivation in objecting to the sale is to compel me to abandon my interest in the shares so that they may revert to him.

89.    However, the Debtor's self-serving statement is designed to permit him to retain ownership of the Netline shares and to prevent the Estate's creditors from realizing any benefit from the sale of the shares.

90.    I request that this Court grant my application as it is in the best interest of the Estate and request that the sale be subject to higher and better offers and the Articles of Association of Netline at a hearing to be conducted before the Court and also that the stock be sold free and clear of all claims and encumbrances, with all liens to attach to the proceeds.

91.    I also request that the Order be entered with the protections accorded to a good faith purchaser under 11 U.S.C. § 363 (m).

THE DEBTOR SHOULD BE DIRECTED TO COMPLY
WITH THE TRUSTEE OR IN THE ALTERNATIVE,
THE TRUSTEE SHOULD BE AUTHORIZED TO UNDERTAKE
ALL EFFORTS REQUIRED TO EFFECTUATE THE
TRANSFER OF THE NETLINE SHARES FROM ENJOY TO THE DEBTOR

92.    As part of the motion, I am requesting an Order directing the Debtor to comply with the Trustee's efforts to have the 288 shares of Netline officially and formally transferred to the Estate.

93.    I was advised by special counsel in Israel that the shares that are the subject of this Motion are in the name of Enjoy and are not recognized on the books and records of Netline as being owned by the Debtor and YFT.

94.    So as to not be an impediment to the transfer of shares to King Capital, Inc., I respectfully request that this Court issue an order under § 105, directing the Debtor to execute any documents required by me or the Board of Directors of Netline to effectuate the transfer of the Debtor's interest in the stock previously held by Enjoy.

95.    In the event that the Debtor fails to comply with this directive, I request authorization to execute any documents required by the Board of Directors of Netline to consummate the transaction contemplated herein.

96.    There is no prejudice to the Debtor as I am only seeking to transfer those shares that he identified as being owned by him as of the Petition date.

97.    I recognize that this is not routinely requested because an Order of the Bankruptcy Court authorizing the transfer of the shares should be sufficient, but since we are dealing with a foreign entity whose representatives may not be familiar with the practices of the United States Bankruptcy Court, I am erring on the side of caution when seeking such relief.

98.    I request that this Court grant the application in its entirety and waive the requirement of the filing of a memorandum of law as no novel issue of law is present with respect to the issues herein.

99.    No prior application has been made to this or any other Court for the relief requested herein, except as stated above.

WHEREFORE, it is respectfully requested that this Honorable Court grant the Trustee's motion in its entirety and such other and further relief as this Court deems just and proper.

Dated: Garden City, New York
      February 5, 2014

_____
Marc A. Pergament