WINSTON & STRAWN LLP
David Neier (dneier@winston.com)
Carrie V. Hardman (chardman@winston.com)
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

**Hearing Date: September 22, 2014**
**Hearing Time: 2:00 P.M. ET**

*Attorneys for the IMC Disbursing Trust*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

In re                                                  :   Chapter 11
                                                       :
Interfaith Medical Center, Inc.,[1]                    :   Case No. 12-48226 (CEC)
                                                       :
                                          Debtor.      :
-------------------------------------------------------- x

### JOINDER AND LIMITED OBJECTION OF THE IMC DISBURSING TRUST TO THE FEE APPLICATIONS OF WILLKIE FARR & GALLAGHER LLP

TO THE HONORABLE CARLA E. CRAIG,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

        The IMC Disbursing Trust (the "Disbursing Trust"), established pursuant to that certain

order (the "Confirmation Order")[2] confirming the Second Amended Plan of Reorganization (the

"Plan")[3] for Interfaith Medical Center, Inc., the debtor and debtor in possession in the above-

captioned case (the "Debtor"), hereby submits this joinder to the *Objection of the United States*

*Trustee to Final Applications for Compensation and Reimbursement of Expenses* [Docket No.

1319] (the "UST's Objection") and limited objection (the "Objection") to the interim and final

---

[1] The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.
[2] The "Confirmation Order" refers to the *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Plan of Reorganization for Interfaith Medical Center, Inc.* [Docket No. 1158] filed and entered in the above-captioned case on June 11, 2014.
[3] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Confirmation Order and Plan.

fee applications of Willkie Farr & Gallagher LLP ("WFG").  In support of its Objection, the

Disbursing Trust, by and through its undersigned counsel, respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Throughout this proceeding, it has been eminently clear that, in light of case

circumstance, the Debtor and other key parties' professionals (the "Professionals") needed to

work efficiently and bill judiciously.  The Debtor is a charitable hospital primarily providing

underprivileged residents of the Bedford-Stuyvesant community with essential health care

services.  According to our records, however, over $15.5 million in fees and expenses have

accrued and are sought[4] by the Professionals on account of services rendered throughout the

Debtor's bankruptcy case.

2.      After careful review and consideration, the Disbursing Trust determined that the

total and final fee requests of a few Professionals, including WFG, should be reduced.[5]

Accordingly, in addition to the reasons described herein, the Disbursing Trust joins the UST's

Objection with respect to the reductions sought from WFG and reasons thereon.

3.      The Disbursing Trust files this objection regrettably and with sincere hope that an

acceptable resolution can be achieved in advance of a hearing on the WFG fee applications.

Appropriate and fair reductions in the WFG fee applications will further ensure the Disbursing

Trust can fulfill its obligations to pay administrative, priority and secured claims, and, pursuant

to the Plan, any amounts remaining in the Disbursing Trust's Backstop Reserve of up to $2

---

[4] These amounts include fees and expenses accrued during the case, as well as reserves sought by various Professionals for time and services expended in preparing for the hearing on the, and defense of their respective, fee applications.

[5] Those Professionals included WFG, CohnReznick LLP ("CohnReznick"), Alston & Bird LLP ("A&B"), and CBIZ Accounting, Tax and Advisory of New York, LLC ("CBIZ").  The Disbursing Trust and the Dormitory of the State of New York ("DASNY"), have each reached agreement as to a reduction in the amount of fees sought by CohnReznick, A&B and CBIZ.  Thus, subject to the agreed-upon reductions, which will be presented to this Court for approval at the hearing on the Professionals' final fee applications, the Disbursing Trust does not object to the relief sought by CohnReznick, A&B, and CBIZ, or any of the other Professionals seeking final allowance and compensation.

million and up to an aggregate of an additional $1 million remaining in any other Reserve shall be paid to the Litigation Trust for distribution to holders of Allowed unsecured claims.

## BACKGROUND

4.      The Debtor filed for bankruptcy protection on December 2, 2012 (the "Petition Date"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

5.      On December 13, 2012, the Office of the United States Trustee for the Eastern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors in this case (the "Committee").

6.      By order dated January 18, 2013 [Docket No. 145], WFG was retained as restructuring counsel to the Debtor, effective as of the Petition Date.

7.      On June 11, 2014 (the "Confirmation Date"), the Bankruptcy Court entered the Confirmation Order, confirming the Plan.  The Plan became effective on June 19, 2014.

8.      WFG filed its final fee application in three parts on (i) July 21, 2014 [Docket No. 1249] (the original "WFG Fee Application"), (ii) July 22, 21014 [Docket No. 1255] (the "First WFG Supplement"), and (iii) September 9, 2014 [Docket No. 1311] (the "Second WFG Supplement" and, together with the original WFG Fee Application and the First WFG Supplement, the "WFG Fee Application").  Pursuant to the WFG Application, WFG seeks a total of $5,400,475.50 in fees[6] and $59,025.50 in expenses.[7]

---

[6] This total amount of fees includes (a) $5,338,744.50 sought in the original WFG Fee Application, (b) $9,184 sought in the Second WFG Supplement under the category of "Retention of Professionals – Application, Preparation," (c) $27,547 sought in the Second WFG Supplement under the category of "Fee Application – Preparation and Defense," and (d) $25,000 amounting to a reserve sought by WFG in the Second WFG Supplement in the event substantive objections are raised against WFG (*See* Docket No. 1311, at ¶ 5).

[7] This total amount of expenses includes (a) $58,887.61 sought in the original WFG Fee Application, (b) $104.41 sought in the Second WFG Supplement under the category of "Retention of Professionals – Application, Preparation," and (c) $33.48 sought in the Second WFG Supplement under the category of "Fee Application – Preparation and Defense."

## **LEGAL STANDARDS**

9.      Section 330(a)(1) of the Bankruptcy Code provides that

> After notice to the parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee . . . or a professional person employed under section 327 or 1103 –
>
> (A)  reasonable compensation for actual, necessary services rendered by the trustee, . . . professional person, or attorney and by any paraprofessional person employed by and such person; and
>
> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

10.      In analyzing fees to determine the amount of reasonable compensation to award a professional under section 330 of the Bankruptcy Code, "the court shall consider the nature, the extent, and the value of such services," and take into account all relevant factors, including—

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

11.      Even in the absence of objection, bankruptcy courts are duty-bound to ensure that the compensation awarded is reasonable and that the fees and expenses were actually and

necessarily incurred.  *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir. 1994); *In re Acevedo*, No. 05-27415, 2010 WL 411105, at *3 (Bankr. E.D.N.Y. Jan. 26, 2010).  The rationale supporting the bankruptcy court's independent duty to review and analyze fee applications is in an effort to "protect the estate 'lest overreaching . . . professionals drain it of wealth which by right should inure to the benefit of unsecured creditors."  *In re Fibermark*, 349 B.R. 385, 394 (Bankr. D. Vt. 2006) (quoting *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).

12.    Interim fee awards are discretionary, and are subject to re-examination and adjustment during the course of the bankruptcy case.  *In re Spanjer Bros., Inc.*, 191 B.R. 738, 747 (Bankr. D. Ill. 1996); *see also In re Fernandez*, 441 B.R. 84, 98-99 (Bankr. S.D. Tex. 2010) (Due to the speculative nature of interim fee awards, they are "always subject to the court's reexamination and adjustment during the course of the case.").  Because of the difficulty in determining whether services were actual and necessary when reviewing interim applications, bankruptcy courts routinely require holdbacks until the end of the case.  *In re Child World, Inc.*, 185 B.R. 14, 18 (Bankr. S.D.N.Y. 1995) (courts commonly use holdbacks to "moderate potentially excessive interim allowances and offer an incentive to timely resolution of the case").

13.    Such holdbacks "assure the possibility of an offset for any amount which is not finally allowable."  *In re City Mattress, Inc.*, 174 B.R. 23, 27 (Bankr. W.D.N.Y. 1994).  Because such holdbacks on account of fees that are allowed, rather than awarded, such professionals are not entitled to interest on account of such holdback amounts unless or until the issuance of a final fee award pursuant to section 330 of the Bankruptcy Code.  *In re Child World, Inc.*, 185 B.R at 18-19;  *In re Glados, Inc.*, 83 F.3d 1360 (11th Cir. 1996) (citing, *inter alia*, *Child World*).

14.    Section 330 requires each applicant to establish that their fees are both reasonable and that their services were beneficial to the estate.  *In re Lederman Enter., Inc.*, 997 F.2d 1321,

1323 (10th Cir. 1993) (requiring reasonableness of fees and further stating that "[a]n element of whether the services were 'necessary' is whether they benefited the bankruptcy estate").

15.    Each applicant bears the burden of proving the reasonableness of its fees and expenses sought, *see Zeisler & Zeisler, P.C. v. Prudential Ins. Co. (In re JLM, Inc.)*, 210 B.R. 19, 24 (2d Cir. B.A.P. 1997); *Tokyo Electron Arizona, Inc. v. Discreet Indus. Corp., 215 F.R.D. 60, 62* (E.D.N.Y. 2003), which it must do by and through detailed, specific, and itemized documentation.  *In re Baker*, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005); *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 836 (Bankr. D. Vt. 1987).  Any uncertainties due to insufficient record keeping are resolved against the applicant.  *In re Poseidon Pools of Am.*, 216 B.R. 98, 100-01 (E.D.N.Y. 1997).

16.    The test for "reasonableness" is an objective one, whereby the court considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances."  *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (citing *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995)).

17.    If a professional-applicant fails to meet its burden on reasonableness, a court may deny the application for compensation, *In re Beverly Mfg. Corp.*, 841 F.2d 365, 371 (11th  Cir. 1988); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 262-63 (3d Cir. 1995) (affirming the lower court's reduction of compensation, including the denial of certain line items, due to insufficient documentation and detailed expenses), and/or may reduce the applicant's fee or expenses when they are disproportionate to the benefit inured to the estate.  *See In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995) (determining that professional was not entitled to fees when it "became plain" that the services rendered "would not yield a net gain" to the debtor's estate).

18.    Establishing reasonableness requires that the professional-applicant monitor their billing practices and make sure staffing relates rationally to the benefits hoped to be achieved. *See Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 961 (9th Cir. 1991) ("an attorney must scale his or her fee to at least the reasonably expected recovery"); *see also In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 322 (9th Cir. 1991)("when a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted").

19.    To that end, bankruptcy courts consider "the various levels of professional expertise" and specifically, "whether the task at hand could have been performed competently by a less experienced professional at a lower cost to the estate." *Fibermark*, 349 B.R. at 396-97.

20.    "[C]ourts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application [and] have endorsed percentage cuts as a practical means of trimming fat from a fee application." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) (citing cases imposing reductions from 5%-22%). To that end, courts routinely apply percentage reductions to the amounts sought. *United States Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989); *Colon v. City of New York*, No. 09-CV-0008, 2012 WL 691544, at *21 (E.D.N.Y. Feb. 9, 2012) (collecting cases).

21.    At the very least, the time spent in preparing a fee application must be reasonable. *Fibermark*, 349 B.R. at 397 (citing *In re S.T.N. Enters., Inc.*, 70 B.R. at 835).[8] "In addition to an

---

[8]Some courts have even held that professionals may not charge for time spent preparing bills and reviewing invoices. Transcript of Hearing, *In re Journal Register Co.*, No. 12-137774 (SMB) (Bankr. S.D.N.Y. Feb. 20, 2013); *S.T.N. Enters.*, 70 B.R. at 838 (noting that a "minority of courts disallow compensation for activities in connection with the application because such activities do not further the interests of the estate but only of its counsel.").

analysis of the time spent by each professional who assisted in preparing a fee application, the total time spent on a fee application must be reasonable." *Fibermark*, 349 B.R. at 397.

### JOINDER

22.     For the reasons described therein, the Disbursing Trust hereby joins the UST's Objection as to the WFG Fee Application and incorporates herein by reference the arguments contained therein as to the WFG Fee Application to the extent such arguments are relevant to and not inconsistent with this Objection.

### OBJECTIONS

23.     As set forth below, reductions here are appropriate.  However, unlike the other major professionals for the Debtor and the Committee, A&B, CBIZ and CohnReznick, WFG refused to provide any meaningful reductions in their fees, even though their rates were by far the highest of any professionals involved in this case and their client is a not-for-profit charitable hospital serving an underprivileged community in Bedford-Stuyvesant.

24.     Of the over $15.2 million in fees accrued by the bankruptcy professionals in this case, over $5.4 million of such fees were accrued and are sought by WFG alone, amounting to over 35% of the total fees sought by professionals in this case.  Instead of accounting for the nature of its client and the case, as did many of the rest of the professionals in this case, WFG charged its standard rates, which in and of themselves are some of the highest in the New York City legal marketplace.

25.     Throughout this case, WFG utilized a team of 48 timekeepers, dedicating 5,929.5 professional and 1,101.2 paraprofessional hours from December 2, 2012 to June 19, 2014.  Of the 5,929.5 hours expended, almost 39% of those hours were incurred by Alan J. Lipkin alone, at the second highest billable rate charged by the firm ($1,130/hour).  Another 22% of the total

hours were incurred by Anna C. Burns, an associate, at the billable rates of $685 to $770 per hour, which rates are more in line with the most senior partners at other firms who worked on this case.

26.     The plethora of professionals in this case makes it easy to consider "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (citing *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995)).  Here, absolutely none of the other professionals charged nearly the rates that WFG did.  The primary attorney, consultant, and advisors at each of the other Professionals charged rates per hour from the low $300s to the high $800s.  No one came close to charging $1,000 per hour, let alone $1,130.  The rate of the primary and senior timekeeper for WFG, Mr. Lipkin, exceeds the rates of Mr. Bunin by approximately 24% and Mr. Neier by approximately 33%, both of whom agreed to significant rate reductions in this case.

27.     In addition to commanding rates far lower than WFG, many of the Professionals voluntarily took reductions without being requested to do so.  A&B billed at the prior-years' rates for 2013 and 2014, resulting in a $49,560 reduction in fees.  CohnReznick did not raise their rates during the course of the case and other Professionals agreed to an hourly rate or project cap to further curtail spending in this case.  Moreover, upon discussion A&B, CohnReznick, and CBIZ agreed to take further reductions of the final fee amounts sought.

28.     On a more detailed basis, WFG should be subject to a significant reduction of 15% to bring WFG's extraordinarily high per hour partner and associate rates more in line with the other Professionals based on applicable case law governing the services WFG performed.  In addition, the various tasks handled solely by Mr. Lipkin over the course of the case at a rate of

$1,130 per hour could have been performed competently by one of the six other partners on the team that charge under $1,000 per hour.  *See Fibermark*, 349 B.R. at 396-97.

29.    Preparation of the WFG Fee Application is also seriously out of line with the amounts charged for this task by the other professionals in this case.  Of the over $5.4 million WFG seeks in fees, WFG incurred over $438,149.50 in fees in connection with the retention and fee applications of WFG, CohnReznick and Donlin Recano, and another $136,409 in connection with the preparation, filing, and defense of the WFG Fee Application.  These amounts alone appear excessive in light of the nature of this case.

30.    In addition, over $15,000 of fees were incurred by a bankruptcy practice coordinator and litigation project coordinator.  It appears that these fees involved ministerial work more appropriately considered overhead, which is simply not compensable.  *See In re S.T.N. Enters.*, Inc., 70 B.R. at 844.

31.    The only discount WFG notes in the WFG Fee Application came as a result of not raising Mr. Lipkin's rate higher than $1,130 per hour in October 2013.  However, it appears that all other WFG professionals and paraprofessionals' rates were raised.  Thus, while this approximately nine (9) month freeze on Mr. Lipkin's rates—from October 2013 to June 2014—presumably resulted in a discount of a quantifiable sum, the reduction of one professional among an entire firm seemingly falls short of the reductions needed in this case.

32.    To the extent raised, WFG is also not entitled to interest on account of any holdback amounts unless or until the issuance of a final fee award pursuant to section 330 of the Bankruptcy Code.  *In re Child World, Inc.*, 185 B.R at 18-19;  *In re Glados, Inc.*, 83 F.3d 1360 (citing, *inter alia*, *Child World*).

33.    For this and other reasons, WFG should be subject to a reduction in its fees in line with the other Professionals in this case.

**PROPOSED FEE ALLOWANCE**

34.    Fee application concerns regarding excessive rates, staffing, and efficiency do not easily lend to a final allowance amount.  Based on the aforementioned factors, the Disbursing Trust believes that a reduction of the fee amount sought by WFG by 15%, or $810,071.33, is fair and warranted under the circumstances.

**CONCLUSION**

WHEREFORE, the Disbursing Trust respectfully requests that the Court (i) allow the fees requested by the Professionals, less a reduction of the fees sought as described in this Objection or on the record of the hearing of the Professionals' fee applications; (ii) allow the expense reimbursements requested by the Professionals; and (iii) provide the Disbursing Trust such other and further relief as is just and proper.

Dated: September 15, 2014

WINSTON & STRAWN LLP
*/s/ David Neier*

David Neier (dneier@winston.com)
Carrie V. Hardman (chardman@winston.com)
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for the IMC Disbursing Trust*